AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)     ☐ Original   ☐ Duplicate Original

# UNITED STATES DISTRICT COURT
for the
Central District of California

FILED
CLERK, U.S. DISTRICT COURT

JULY -9 2020

CENTRAL DISTRICT OF CALIFORNIA
BY: _____slo_____ DEPUTY

| | |
|---|---|
| United States of America<br>v.<br>SUSANA RAMIREZ OROZCO,<br>Defendant | Case No. |

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

Between on or about January 6, 2020 and the present in the county of Los Angeles in the Central District of California, the defendant violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1956(h) | Conspiracy to commit money laundering |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

Silvana Restrepo
*Complainant's signature*

Silvana Restrepo, DEA Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:  7/9/2020

John E. McDermott
*Judge's signature*

City and state:  Los Angeles, California     Hon. John E. McDermott, U.S. Magistrate Judge
*Printed name and title*

**AFFIDAVIT**

I, Silvana Restrepo, being duly sworn, declare as follows:

## I. INTRODUCTION

1. I am a Special Agent with the United States Department of Justice, Drug Enforcement Administration ("DEA"). I am currently assigned to the Los Angeles Field Division ("LAFD"). At the LAFD, I am assigned to the Financial Investigations Group ("FIG"). As such, I am an "investigative or law enforcement officer" of the United States within the meaning of Title 18, United States Code, Section 2510(7); that is, an officer of the United States empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code, Section 2516.

2. I have worked for the DEA as a Special Agent since approximately April 2019. I have received training and have experience investigating violations of federal narcotics and money laundering laws, including but not limited to, Title 21, United States Code, Sections 841, 846, 952, 959 and 963, and Title 18, United States Code, Section 1956(a). I have been involved in electronic surveillance methods, the debriefing of defendants, informants and witnesses, as well as others who have knowledge of the manufacturing, distribution, transportation, and storage of controlled substances and the laundering of drug proceeds. Prior to becoming a DEA Special Agent, I attended a 17-week Basic Agent Academy at the DEA Training Academy in Quantico, Virginia, that included training on computer-related investigations and computer technology.

3. Throughout my law enforcement career, I have investigated individuals and criminal organizations which have represented a significant threat to public safety and national security. Specifically, during the course of my employment, I have received comprehensive, formalized instruction to include such topics as drug identification, money laundering techniques, patterns of drug trafficking, complex conspiracies, the exploitation of narcotics traffickers' telecommunications devices, criminal law, surveillance, and other investigative techniques. I have participated in investigations into the unlawful possession with intent to distribute, and distribution of narcotics and controlled substances, the laundering of narcotics proceeds, trafficking of controlled substances, and conspiracies associated with narcotics offenses.

4. I have participated in many aspects of drug investigations. I am familiar with narcotics traffickers' methods of operation, including the manufacturing, storage, transportation, and distribution of narcotics, the collection of money that represents the proceeds of narcotics trafficking, and money laundering. I am also familiar with the manner in which narcotics traffickers transport and distribute narcotics in areas they control.

5. I am familiar with the facts and circumstances described herein. This affidavit is based upon my personal involvement in this investigation, my training and experience, and information obtained from various law enforcement personnel and witnesses, including information that has been reported to

me either directly or indirectly, but does not purport to set forth my complete knowledge or understanding of the facts related to this investigation. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only. All figures, times, and calculations set forth herein are approximate.

## II. PURPOSE OF AFFIDAVIT

6. This affidavit is made in support of a criminal complaint against, and an arrest warrant for, Susana RAMIREZ Orozco ("RAMIREZ"), for a violation of 18 U.S.C. § 1956(h) (conspiracy to commit money laundering).

7. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and arrest warrant and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## III. STATEMENT OF PROBABLE CAUSE

### A. Summary of Probable Cause

8. Since November 2018, the DEA LAFD-FIG has been investigating the money laundering and drug trafficking activity of the Cartel de Jalisco Nueva Generacion ("CJNG") in the United

States, Mexico, Colombia, and elsewhere. In July 2019, LAFD FIG agents received information from a reliable confidential source ("CS-1")[1] that CS-1 was in contact with RAMIREZ, a Mexico-based money launderer believed to be laundering funds on behalf of CJNG.

9. As more fully described below, in March 31, 2020, I, acting in an undercover ("UC") capacity, was introduced to RAMIREZ by CS-1, and I purported to be a Los Angeles-based money broker capable of fulfilling money "contracts" - that is, requests to retrieve and deliver drug proceeds from the United States to elsewhere (such as Mexico) in exchange for a commission. I also helped introduce other UC officers and agents purporting to be couriers assisting me in executing such money contracts. Thereafter, RAMIREZ and two co-conspirators, Alejandro Last Name Unknown ("ALEJANDRO") and Raul LANEGRA ("LANEGRA"), coordinated with me for the pickup of bulk cash currency located in the United States to be subsequently wire transferred, through a Los Angeles-based DEA UC bank account, to Mexico-based bank accounts as directed by RAMIREZ. RAMIREZ coordinated multiple money contracts for bulk cash located in the Cleveland, Ohio area, which I and other UC agents arranged

---

[1] CS-1 was previously involved in laundering funds on behalf of a drug trafficking organization but was not charged. CS-1 is being paid to assist law enforcement. I have spoken by telephone with CS-1, and DEA agents from my office have met with CS-1 in person. I am supervising CS-1's role as a confidential source in this investigation. I and other law enforcement have taken steps to corroborate information provided by CS-1, and the information provided by CS-1 relating to this investigation, including that set forth herein, has shown to be reliable and accurate.

4

to have picked up and subsequently wire-transferred to Mexico-based accounts as directed by RAMIREZ. During the course of this investigation, RAMIREZ is believed to have arranged for the transfer of approximately $184,280 in suspected drug proceeds.

    **B.    Background discussions between RAMIREZ and CS-1**

    10.    On January 7, 2020, DEA agents debriefed CS-1, who said that on or around January 6, 2020, he/she received a phone call from RAMIREZ. According to CS-1, RAMIREZ claimed she had millions of dollars in U.S. currency located in the U.S. and needed to arrange for that currency to be picked up in New York and wired to Mexican bank accounts. CS-1 said that RAMIREZ agreed to pay CS-1 a 6% commission for fulfilling such contracts, and they agreed to conduct a relatively small pickup for $30,000 as a test case, with future pickups of higher amounts if the first contract was successful. CS-1 said RAMIREZ claimed the bulk cash was located in Cincinnati, Ohio, but could also be retrieved from New York. According to CS-1, CS-1 lost the contract at the last minute when RAMIREZ said her client wanted to use another individual to fulfill the money contract. However, agents instructed CS-1 to continue discussing and brokering future money contracts with RAMIREZ.[2]

---

[2] Certain of CS-1's telephonic communications with RAMIREZ were not recorded due to a technical storage limitation with CS-1's telephone. However, according to CS-1, many of CS-1's communications with RAMIREZ were via WhatsApp and were preserved; I have reviewed those preserved communications to corroborate what CS-1 has told law enforcement in debriefs. CS-1 has also identified a photograph of Susana RAMIREZ Orozco obtained from law enforcement database records as matching the individual with whom he was communicating and knew as "Susana,"

11. According to CS-1, in late March 2020, RAMIREZ called CS-1 and claimed that there was $100,000 that needed to be retrieved in Cleveland, Ohio and transmitted to Mexico. According to CS-1, RAMIREZ said she works with LANEGRA, who in turn (according to RAMIREZ) works for a "powerful man" in Jalisco. CS-1 understood RAMIREZ's reference to a "powerful man" to be CJNG leader Nemesio OSEGUERA-Cervantes aka "El Mencho," or someone associated with CJNG working for OSEGUERA. According to CS-1, the individual for whom LANEGRA was working paid LANEGRRA approximately 10 billion Mexican pesos (approximately $417 million) to launder money through government contracts. According to CS-1, a few weeks prior to this communication, RAMIREZ told CS-1 that RAMIREZ's associate, LANEGRA, who was the individual who approached RAMIREZ about this money contract, asked RAMIREZ if she could find someone in Cleveland who could launder the money, leading RAMIREZ to contact CS-1. CS-1 then introduced me, acting in an undercover capacity, to RAMIREZ, as his United States-based money laundering contact physically located in Los Angeles, and provided RAMIREZ with my telephone number. Thereafter, I began engaging in direct communications with RAMIREZ to discuss the possibility of fulfilling money contracts in the United States.[3]

---

based on his having seen a separate photograph associated with a social media account in the name of "Susana Ramirez Orozco" that "Susana" had identified to CS-1 as her social media account.

[3] My calls with RAMIREZ were recorded and took place in Spanish. I am fluent in Spanish and in English and my discussion of calls with RAMIREZ is based on my memory of those calls, my listening to recordings of those calls, and my interpretations of the calls as a participant.

6

### C. RAMIREZ coordinates multiple money transfers

12. During the course of our discussions, RAMIREZ told me she has money contracts for money located in Texas and Virginia, which also needed to be retrieved and remitted to Mexico. Starting on or about March 31, 2020, we coordinated a money contract for cash to be picked up in Cleveland, Ohio, to be remitted to Mexico. On April 9, 2020, I coordinated with other DEA agents in Cleveland, Ohio to fulfill this money contract that RAMIREZ had offered me. RAMIREZ passed the contact information of her Cleveland-based courier to CS-1 and confirmed with me that she had done so, identifying the courier as "Monica." A courier identifying herself by a passcode then contacted an undercover agent ("UC-1") with DEA's Cleveland District Office ("CDO") as the individual working for me in Cleveland. "Monica" subsequently passed along the information of an individual she claimed to be her brother-in-law ("Courier 1"), who she said would deliver the money. Courier 1 ultimately delivered $19,980 in Cleveland to UC-1. In connection with dropping off the funds, Courier 1 was seen engaging in counter-surveillance measures, and delivered the funds in a yellow plastic bag. Courier 1 stated that he had been "running around getting the money because they didn't have all of it." After UC-1 obtained the funds, these funds (less commission) were then wire-transferred, represented to be from my money laundering organization (but in reality, a Los Angeles-based DEA UC account) to bank account(s) in Mexico that had been specified by

7

RAMIREZ to me or to CS-1. RAMIREZ confirmed receipt. The $19,980 was a test load in order for future deals with RAMIREZ.

13. Following this transaction, RAMIREZ asked me if I could fulfill another money contract to pick up $65,000. RAMIREZ also told me and CS-1 that she hoped to be able to solicit pickups of approximately $200,000 each week from Cleveland to be transferred to Mexico.

14. On May 5, 2020, CS-1 and I, along with another undercover agent ("UC-2") and other DEA agents from the CDO, worked to coordinate a money contract of ultimately retrieving $28,845, as directed by RAMIREZ, in Cleveland, Ohio. Pursuant to direction provided by RAMIREZ, UC-2 met with a female ("Courier 2"). Courier 2 delivered $28,845 to UC-2 – the funds were in a white trash bag inside Courier 2's pink shoulder bag, which was further concealed in postal wrapping that contained the bulk currency. The funds (less commission) were then wire-transferred from the above-referenced DEA UC account to bank account(s) in Mexico that had been specified by RAMIREZ. RAMIREZ confirmed receipt.

15. On May 26, 2020, I, along with another undercover agent ("UC-3") and other DEA agents from the CDO worked to coordinate ultimately retrieving $43,555, as directed by RAMIREZ, in Cleveland, Ohio. UC-3 picked up the funds from a male ("Courier 3"). The funds (less commission) were then wire-transferred from DEA's Los Angeles-based UC account to bank account(s) in Mexico that had been specified by RAMIREZ. RAMIREZ confirmed receipt.

**D. Calls with RAMIREZ and attempted money contract**

16. On or about May 27, 2020, still acting in my UC capacity, I informed RAMIREZ via telephone that I had received her money from the last money transaction (May 26, 2020) and that I was working on transferring her money into the Mexican bank account she provided. I informed RAMIREZ that my people were not interested in moving more money for RAMIREZ due to her inability to move the larger quantities of money she had promised when I initially started fulfilling money contracts for her. I informed RAMIREZ that it was not in the best interest of my organization to continue dealing with such small quantities of money since the profit I was making was not worth all the work. I explained to RAMIREZ that if she had business in Los Angeles that it would be easier for me to move money for RAMIREZ since I am established in Los Angeles. I told her that I had bigger clients and that her amounts were not worth it.

17. On or about May 27, 2020, RAMIREZ contacted me and advised that she was with her associates LANEGRA and ALEJANDRO and that they were on the phone with her and that she wanted me to explain to them the reason I was not willing to continue to accept money contracts for her organization any longer. I explained that RAMIREZ claimed to be working for a large client that needed to move large quantities of money, but that so far she had not been able to provide the larger contracts she had initially claimed to be able to provide. LANEGRA said that the issue was the client and that they had come to an agreement with the client to alleviate these issues. LANEGRA stated that this

9

particular client was just one person and that they had other clients.

    a. LANEGRA stated that he understood my frustrations but that they had come to an agreement with this client to move approximately $400,000 each month, for which I would receive a 5% commission. LANEGRA explained that I could collect the 5% commission from the first money pickup (the monthly amount was to be divided into pickups of approximately $100,000 each week) whether I moved $400,000 that month or not. LANEGRA wanted to give this client one more opportunity to coordinate more money pickups under this new agreement before I decided to stop moving money for this client.

18. Between June 3 and 9, 2020, I had multiple telephone conversations with RAMIREZ and ALEJANDRO. In these calls, RAMIREZ would contact me and connect ALEJANDRO to the call. In all of these calls, RAMIREZ participated and, in fact, refused to let me contact ALEJANDRO directly; rather, she would join him to calls and stay on the line and participate herself. During these calls, in all of which RAMIREZ participated, the following discussions took place:

    a. I told ALEJANDRO and RAMIREZ that I was already established in Los Angeles and that it was easier for me to fulfill money contracts if the money was picked up in Los Angeles instead of moving the money from Cleveland to Mexico. ALEJANDRO said that once he inquired to his client about Los Angeles, there might be some "products" that come with that, that might give me "headaches" (which I understood him to mean

10

that his client also dealt with drug trafficking and might ask me to assist with drug trafficking). I told ALEJANDRO and RAMIREZ that I was familiar with the transportation and logistics of the products that I believed ALEJANDRO was referring to; at this point, ALEJANDRO described the product as "candy," which I believe to be a reference to cocaine. I said that I was Colombian and that my business was to move this kind of product and that this type of business (drug trafficking) made it possible for me to also move/launder money (i.e., drug proceeds). ALEJANDRO said that he understood that I was knowledgeable of the "candy" business and the money business.

       b. ALEJANDRO said that he was working for the Mayo Zambada Organization ("MZO"). ALEJANDRO also said his group was a new channel the organization was using to strengthen their organization since some doors closed down for the organization and that they were testing RAMIREZ's and ALEJANDRO's team.[4] ALEJANDRO explained that my ability to move product and money would strengthen his ability to establish trust with the MZO. ALEJANDRO said that he needs money moved to Colombia, Ecuador, and Panama, and that right now ALEJANDRO's organization has to move the money through Mexico. ALEJANDRO suggested that it would be helpful if I could provide the money directly to those destinations from the United States rather than his group from

---

[4] In my training and experience, large-scale drug cartels often employ multiple money-laundering organizations/operations to disguise the ownership of cartel drug proceeds and I believe RAMIREZ and her co-conspirators' money-laundering activities are designed to conceal the source of the drug proceeds being laundered.

11

Mexico. ALEJANDRO stated that ideally he would like to provide a service in which his group was able to move anything the MZO needed anywhere. ALEJANDRO said that his goal was to move approximately $1 million worth of product (which I understood to be a reference to drugs) every month.

      c. In other calls, RAMIREZ, ALEJANDRO and I discussed the transportation of one shoebox full of "candies," which I understood in context to refer to cocaine. ALEJANDRO stated that the "merchandise" was ready for pick up in Los Angeles and that if I was ready, I could either pick it up or someone else could deliver the box to me. ALEJANDRO asked me how much I would charge to transport the box from Los Angeles to Cleveland. I told ALEJANDRO that I would charge approximately $1,000 for one box, but that if he was able to deliver ten boxes or more, I would charge $750 per box. I told ALEJANDRO and RAMIREZ that I would not be making money on one box but offered to do so anyway; I claimed that I was willing to do so since my driver was driving through Cleveland (to pick up related bulk cash as arranged by RAMIREZ) and I was interested in further business with ALEJANDRO and/or whatever organization he and RAMIREZ were working with.

      d. ALEJANDRO asked me if the $1,000 transportation fee for transporting one box of drugs was part of the commission I was going to collect that same weekend for a separate money contract involving a pickup in Cleveland, which I had previously discussed with RAMIREZ. ALEJANDRO asked that I provide a better deal to him because a successful delivery would lead to me being

12

able to move larger quantities (and make more money). I told ALEJANDRO that we could talk about that at a later time, once the first movement was successful.

   e. I explained to ALEJANDRO and RAMIREZ that they had to be very careful because many cities around the U.S. had a curfew and there was a large law enforcement presence in every city and that ALEJANDRO wouldn't want the money to be seized by law enforcement. ALEJANDRO said that it was bad to have money stolen and that the money being seized by law enforcement was the equivalent of the money being stolen, that to him it was the same.

   f. ALEJANDRO told me that his client asked ALEJANDRO to find a warehouse in Cleveland where his client could store his money and merchandise in addition to the houses that his client was already renting throughout Cleveland. ALEJANDRO told me that they needed a trustworthy person like me who could administer the warehouse. ALEJANDRO told me that he/his associates would pay the rent and that I could either use the warehouse as an actual store and sell products out of the warehouse or that, I could just use the warehouse as a front. ALEJANDRO told me that he needed to be able to have his trucks arrive at this location to load and unload his "product," which I believe to be drugs as well as his money. I asked him if his client needed help with the product and the money and he explained that a truck would arrive at the warehouse loaded with furniture (which is legal), but among that furniture there would be approximately two pallets of other product which ALEJANDRO

13

and his people would handle at that point. He asked me to manage the warehouse, specifically the product, which I believed to be money and drugs that arrived at the warehouse. I told ALEJANDRO that I was going to consult with my people regarding the warehouse. RAMIREZ was on the call during this discussion.

19. On June 9, 2020, I, along with other DEA agents from the CDO, worked to coordinate a money pickup of $91,900, pursuant to directions provided by RAMIREZ, in Euclid, Ohio. This was to be the first of the weekly money contracts (totaling $400,000 per month) discussed above in which I was to take a 5% commission. RAMIREZ instructed me to have my courier provide a courier who was to provide my courier a passcode. I then arranged for another DEA UC to meet with a courier, pursuant to instructions from RAMIREZ, to pick up the money. Based on information provided by RAMIREZ, law enforcement identified the courier delivering the $91,900 as Courier 3. Prior to the exchange, the Ohio State Highway Patrol conducted a traffic stop of Courier 3 (who had also delivered the funds in connection with the May 26, 2020 exchange, described above). A trained narcotics K-9 alerted to Courier 3's vehicle, which contained $91,900 in bulk cash. Courier 3 denied knowledge of the currency.

## IV. CONCLUSION

20. For all the reasons described above, there is probable cause to believe that RAMIREZ has committed a violation of 18 U.S.C. § 1956(h) (conspiracy to commit money laundering).

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this <u>9TH</u> day of July,
2020.

*John E. McDermott*

HONORABLE JOHN E. MCDERMOTT
UNITED STATES MAGISTRATE JUDGE

15